## **Index to Exhibits to Complaint**

A.  American Arbitration Association (AAA) letter dated December 30, 2020 to Plaintiff Brandon.

B.   AAA letter dated February 24, 2021 to Plaintiff Bedgood.

C.  AAA letter dated December 30, 2020 to Lawrence Sidney Connor, Esq.

D.  Order of April 22, 2020, Judge Roy B. Dalton, Jr. denying Wyndham's motion to dismiss. *Buxton v. Wyndham Vacation Resorts, Inc.* ( No. 19-cv-1555-Orl-37DCI), *Campbell v. Wyndham Vacation Resorts, Inc.* (No. 19-cv-01556-Orl-37DCI), *Blessing v. Wyndham Vacation Resorts, Inc.*, (No. 19-cv-1613-Orl-37DCI); *Chandler v. Wyndham Vacation Resorts, Inc.*, (No. 19-cv-1647-Orl-37DCI), and *Mason v. Wyndham Vacation Resorts, Inc.*, (No. 19-cv-1613-Orl-37DCI).

E.  Charles Harold Bedgood Wyndham contract dated December 19, 2019.

F.  Joel Brandon and Hannah Heil-Brandon Wyndham contract date December 19, 2019.

G.  Eddie Mathews Jr. and Reena T. Smith Wyndham contract dated March 18, 2019.

H.  Justin Diaz and Candice Clark WorldMark/ WRDC contract dated April 6, 2018.

I.  Roslind Christine Harper Wyndham contract dated July 8, 2019 in Nevada.

AMERICAN
ARBITRATION
ASSOCIATION

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION

1101 Laurel Oak Road
Voorhees, NJ 08043

December 30, 2020

Joel Brandon
███ ███ ████████ ███ue
████, NC 28334
Via Email to: ████████████2@█████████

Wyndham Destinations
6277 Sea Harbor Drive
Orlando, FL 32821
Via Mail

**Case Number: 01-20-0016-0486**

Joel Brandon
-vs-
Wyndham Destinations

Dear Parties:

Claimant has filed with us a demand for arbitration. We note that the arbitration clause provides for arbitration by the American Arbitration Association ("AAA").

Prior to the filing of this arbitration, Wyndham Destinations failed to comply with the AAA's policies regarding consumer claims. Accordingly, we must decline to administer this claim and any other claims between Wyndham Destinations and its consumers at this time. These policies can be found on our web site, www.adr.org, in the Consumer Due Process Protocol ("Protocol") and the Consumer Arbitration Rules ("Consumer Rules"), including the Costs of Arbitration.

Accordingly, we have administratively closed our file and will refund any payment received by the filing party. According to R-1(d) of the Consumer Rules, should the AAA decline to administer an arbitration, either party may choose to submit its dispute to the appropriate court for resolution.

If you believe we have declined this matter in error, please email ConsumerFiling@adr.org .

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system. Such electronic documents may not constitute a complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely, electronic case documents will be destroyed 3 months after the date of this letter.

If Wyndham Destinations advises the AAA in the future of its intention to comply with the AAA's Consumer Arbitration Rules and if applicable, resolves any outstanding payment obligations, the AAA may consider at its sole discretion, accepting newly filed consumer cases going forward. Therefore, if Wyndham Destinations wishes for the AAA to consider accepting consumer disputes going forward, Wyndham Destinations must, at a minimum, register its clause on the Consumer Clause Registry on our website, www.adr.org/clauseregistry. Upon completion of the registration process and confirmation from the AAA that the business is now active on the Consumer Clause Registry, Wyndham Destinations is responsible for informing all parties that Claimant may re-file their claim.

*Exhibit A*

Sincerely,

Consumer Filing Team
ConsumerFiling@adr.org
Fax: (877) 304-8457



**AMERICAN ARBITRATION ASSOCIATION**   INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

1101 Laurel Oak Road
Voorhees, NJ 08043

February 24, 2021

Charles H. Bedgood
~~[redacted]~~
~~[redacted]~~
Via Email to: ~~[redacted]~~

Wyndham Vacation Club
6277 Sea Harbor Drive
Orlando, FL 32821
Via Email to: alicia.dickson@wyn.com

Claudia Roark
Barclays Bank Delaware
125 South West Street
Wilmington, DE 19801
Via Email to: croark@barclaycardus.com

**Case Number: 01-21-0000-3547**

Charles Bedgood
-vs-
Wyndham Vacation Club
-vs-
Barclays Bank

Dear Parties:

Claimant has filed with us a demand for arbitration. We note that the arbitration clause provides for arbitration by the American Arbitration Association ("AAA").

Prior to the filing of this arbitration, Wyndham Vacation Club failed to comply with the AAA's policies regarding consumer claims. Accordingly, we must decline to administer this claim and any other claims between Wyndham Vacation Club and its consumers at this time. These policies can be found on our web site, www.adr.org, in the Consumer Due Process Protocol ("Protocol") and the Consumer Arbitration Rules ("Consumer Rules"), including the Costs of Arbitration.

Accordingly, we have administratively closed our file and will refund any payment received by the filing party. According to R-1(d) of the Consumer Rules, should the AAA decline to administer an arbitration, either party may choose to submit its dispute to the appropriate court for resolution.

If you believe we have declined this matter in error, please email ConsumerFiling@adr.org .

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system. Such electronic documents may not constitute a complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely, electronic case documents will be destroyed 3 months after the date of this letter.

*Exhibit B*

If Wyndham Vacation Club advises the AAA in the future of its intention to comply with the AAA's Consumer Arbitration Rules and if applicable, resolves any outstanding payment obligations, the AAA may consider at its sole discretion, accepting newly filed consumer cases going forward. Therefore, if Wyndham Vacation Club wishes for the AAA to consider accepting consumer disputes going forward, the business must, at a minimum, register its clause on the Consumer Clause Registry on our website, www.adr.org/clauseregistry. Upon completion of the registration process and confirmation from the AAA that the business is now active on the Consumer Clause Registry, Wyndham Vacation Club is responsible for informing all parties that Claimant may re-file their claim.

Sincerely,

Consumer Filing Team
ConsumerFiling@adr.org
Fax: (877) 304-8457



ELECTRONICALLY FILED - 2020 Dec 30 3:49 PM - HORRY - COMMON PLEAS - CASE#2020CP2607441

**AMERICAN ARBITRATION ASSOCIATION®** | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

1101 Laurel Oak Road
Voorhees, NJ 08043
Telephone: (856)435-6401

December 30, 2020

Lawrence Sidney Connor, Esq.
Kelaher Connell & Connor PC
Post Office Drawer 14547
Surfside Beach, SC 29587-4547
Via Email to: ~~connor@~~ ~~k~~ ~~lawfirm.net~~

Lurlene Morris
Wyndham Destinations
6277 Sea Harbor Drive
Orlando, FL 32821
Via Email to: lurline.morris@wyn.com

Case Number: 01-20-0015-9102

James M. and Judith A. Reynolds
-vs-
Wyndham Vacation Ownership

Dear Parties:

Claimant has filed with us a demand for arbitration. We note that the arbitration clause provides for arbitration by the American Arbitration Association ("AAA").

Prior to the filing of this arbitration, the business failed to comply with the AAA's policies regarding consumer claims. Accordingly, we must decline to administer this claim and any other claims between Wyndham Vacation Ownership and its consumers at this time. These policies can be found on our web site, www.adr.org, in the Consumer Due Process Protocol ("Protocol") and the Consumer Arbitration Rules ("Consumer Rules"), including the Costs of Arbitration.

Accordingly, we have administratively closed our file and will refund any payment received by the filing party. According to R-1(d) of the Consumer Rules, should the AAA decline to administer an arbitration, either party may choose to submit its dispute to the appropriate court for resolution.

If you believe we have declined this matter in error, please email ConsumerFiling@adr.org.

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system. Such electronic documents may not constitute a complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely, electronic case documents will be destroyed 3 months after the date of this letter.

If the business advises the AAA in the future of its intention to comply with the AAA's Consumer Arbitration Rules and if applicable, resolves any outstanding payment obligations, the AAA may consider at its sole discretion, accepting newly filed consumer cases going forward. Therefore, if the business wishes for the AAA to consider accepting consumer disputes going forward, the business must, at a minimum, register its clause on the Consumer Clause Registry on our website, www.adr.org/clauseregistry. Upon completion of the registration process and confirmation from the AAA that the business is now active on the Consumer Clause Registry, the

EXHIBIT ~~A~~ C

business is responsible for informing all parties that Claimant may re-file their claim.

Sincerely,

Consumer Filing Team
ConsumerFiling@adr.org
Fax: (877) 304-8457

cc:

ELECTRONICALLY FILED - 2020 Dec 30 3:49 PM - HORRY - COMMON PLEAS - CASE#2020CP2607441

EXHIBIT C

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

KEVIN BUXTON; and PAMELA
BUXTON,

     Plaintiffs,

v.                             Case No. 6:19-cv-1555-Orl-37DCI

WYNDHAM VACATION RESORTS,
INC.; and WYNDHAM VACATION
OWNERSHIP, INC.,

     Defendants.

_____

LOUISE CAMPBELL; and DENNIS
HELDMAN,

     Plaintiffs,

v.                             Case No. 6:19-cv-1556-Orl-37DCI

WYNDHAM VACATION RESORTS,
INC.; and WYNDHAM VACATION
OWNERSHIP, INC.,

     Defendants.

_____

Exhibit D

1

MARVIN BLESSING; and MARY JANE
BLESSING,

      Plaintiffs,

v.                                                                                    Case No. 6:19-cv-1613-Orl-37DCI

WYNDHAM VACATION RESORTS,
INC.; and WYNDHAM VACATION
OWNERSHIP, INC.,

      Defendants.

_____

ROY CHANDLER; and MARY
CHANDLER,

      Plaintiffs,

v.                                                                                    Case No. 6:19-cv-1647-Orl-37DCI

WYNDHAM VACATION RESORTS,
INC.; and WYNDHAM VACATION
OWNERSHIP, INC.,

      Defendants.

_____

GEORGE MASON; and MYRTLE
MASON,

      Plaintiffs,

v.                                                                                    Case No. 6:19-cv-1648-Orl-37DCI

WYNDHAM VACATION RESORTS,
INC.; and WYNDHAM VACATION
OWNERSHIP, INC.,

      Defendants.

_____

## ORDER

Fifty-nine related cases were filed by attorney Donald S. Hackett on behalf of individual plaintiffs against Defendants. *See, e.g., Buxton v. Wyndham Vacation Resorts, Inc.*, No. 6:19-cv-1555-Orl-37DCI (Doc. 62). For a just, speedy, and efficient determination of these cases, Mr. Hackett was directed to select five cases ("**First Five**") to proceed, while the remaining fifty-four cases were stayed. (*Id.*) The First Five are before the Undersigned. This Order disposes of the five nearly identical motions to dismiss in the First Five:

- Defendants move to dismiss Plaintiffs Kevin Buxton and Pamela Buxton's (collectively, "**Buxtons**") Third Amended Complaint. *Buxton v. Wyndham Vacation Resorts, Inc.*, No. 6:19-cv-1555-Orl-37DCI ("**Buxton Case**") (Doc. 43). The Buxtons oppose. (Buxton Case, Doc. 49.)

- Defendants moves to dismiss Plaintiffs Louise Campbell ("**Campbell**") and Dennis Heldman's ("**Heldman**") Third Amended Complaint. *Campbell v. Wyndham Vacation Resorts, Inc.*, No. 6:19-cv-1556-Orl-37DCI ("**Campbell Case**") (Doc. 46). Campbell and Heldman oppose. (Campbell Case, Doc. 51.)

- Defendants moves to dismiss Plaintiffs Marvin Blessing and Mary Jane Blessing's (collectively, "**Blessings**") Third Amended Complaint. *Blessing v. Wyndham Vacation Resorts, Inc.*, No. 6:19-cv-1613-Orl-37DCI ("**Blessing Case**") (Doc. 45). The Blessings oppose. (Blessing Case, Doc. 52.)

- Defendants move to dismiss Plaintiffs Roy Chandler and Mary Chandler's (collectively, "**Chandlers**") First Amended Complaint. *Chandler v. Wyndham*

3

*Vacation Resorts, Inc.*, No. 6:19-cv-1647-Orl-37DCI ("**Chandler Case**") (Doc. 33).
The Chandlers oppose. (Chandler Case, Doc. 36.)

- Defendants move to dismiss Plaintiffs George Mason and Myrtle Mason's (collectively, "**Masons**") First Amended Complaint. *Mason v. Wyndham Vacation Resorts, Inc.*, No. 6:19-cv-1648-Orl-37DCI ("**Mason Case**") (Doc. 34). The Masons oppose. (Mason Case, Doc. 37.)

On review, all five motions to dismiss are denied.

## I. BACKGROUND[1]

### A. Defendants' Business[2]

Defendants are hospitality companies that sell timeshares, purportedly granting partial ownership in various vacation resorts. (*See* Buxton Case, Doc. 39 ¶¶ 2, 13, 18, 24.) Defendant Wyndham Vacation Resorts, Inc. ("**WVR**") is a subsidiary of Defendant Wyndham Vacation Ownership, Inc. ("**WVO**"), with the two sharing offices and directors. (*Id.* ¶¶ 19, 20, 23.) Together, Defendants profited from the multi-billion-dollar timeshare industry by selling "points" to individual consumers. (*Id.* ¶¶ 2, 24, 25.) These individuals contract to pay for a specified number of points. (*Id.* ¶ 25.) These points can then be used to stay at several resorts. (*Id.*) To sell these points and convince consumers

---

[1] The facts in the complaints are taken as true and construed in the light most favorable to Plaintiffs. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

[2] All allegations in this section, regarding Defendants' business, are identical across the First Five's complaints. (*See* Buxton Case, Doc. 39; Campbell Case, Doc. 42; Blessing Case, Doc. 41; Chandler Case, Doc. 29; Mason Case, Doc. 30.) For brevity, the Court cites only to the Buxton Case in this section, but the same allegations can be found at the same paragraphs in the remaining First Five complaints. (*See id.*)

4

to enter into these contracts, Defendants put on presentations. (*Id.* ¶¶ 28–30.)

### B.  Timeshare Presentations

On March 12, 2015, Defendants invited the Buxtons, who were vacationing in Orlando, Florida, to a presentation about Defendants' programs that would last no longer than ninety minutes. (Buxton Case, Doc. 39 ¶¶ 1, 39.) But the presentation was not as advertised. (*Id.* ¶ 39.) It lasted multiple hours, during which Philip Acomb, Hector Colon, and Luis Leison (collectively, "**Sales Agents**")[3] aggressively pitched the purchase of Defendants' timeshares. (*Id.* ¶¶ 39, 40.) The Sales Agents are WVO's employees and WVR's agents. (*Id.* ¶ 39.)

The same thing happened to Campbell and Heldman on July 5, 2016, in Orlando, Florida with Sales Agents Selma Hamidovic and others (Campbell Case, Doc. 42 ¶¶ 1, 39, 40); to the Blessings on December 29, 2014 in Orlando, Florida with Sales Agent Brandon Brown (Blessing Case, Doc. 41 ¶¶ 1, 39, 40); to the Chandlers on March 17, 2013 in Orlando, Florida with an unnamed Sales Agent (Chandler Case, Doc. 29 ¶¶ 1, 39, 40); and to the Masons on December 27, 2011 in Orlando, Florida with unnamed Sales Agents (Mason Case, Doc. 30 ¶¶ 1, 39, 40).

### C.  Statements

In all the cases, at the presentations, the Sales Agents told Plaintiffs[4]: the deal was good only for that day; the Sales Agents would be Plaintiffs' personal representatives,

---

[3] All agents giving presentations to the individual plaintiffs will be collectively referred to as "Sales Agents" in the Court's analysis.

[4] "Plaintiffs" refers to all individual plaintiffs in the First Five.

helping them make the most of their timeshare; the timeshare was a good investment; and Plaintiffs could rent out their timeshare to cover all costs.[5] But these statements weren't true and the Sales Agents knew it.[6] The Sales Agents also exaggerated the usefulness of points and reservation availability to stay at resorts.[7] Plaintiffs all relied on these statements in purchasing timeshares.[8] And when the time came to sign the timeshare contracts, the Sales Agents did not adequately explain Plaintiffs' rescission rights, rushed the closing process, and told Plaintiffs where to sign and initial without explaining what Plaintiffs were signing.[9] The cost of these timeshares was far from negligible. The Buxtons purchased a timeshare from Defendants and paid $85,000. (Buxton Case, Doc. 39 ¶ 7.) Campbell and Heldman's timeshare purchase cost them $150,000. (Campbell Case, Doc. 42 ¶ 7.) The Blessings paid $174,000. (Blessing Case, Doc. 41 ¶ 7.) The Chandlers paid $81,000. (Chandler Case, Doc. 29 ¶ 7.) And the Masons paid $110,000. (Mason Case, Doc. 30 ¶ 7.)

Unhappy with their purchases, Plaintiffs sued Defendants for fraud by omission, unjust enrichment, breach of contract, violation of the Florida Vacation Plan and

---

[5] (Buxton Case, Doc. 39 ¶¶ 42, 44, 48, 51; Campbell Case, Doc. 42 ¶¶ 42, 44, 48, 50; Blessing Case, Doc. 41 ¶¶ 42, 44, 48, 51; Chandler Case, Doc. 29 ¶¶ 42, 44, 48, 51; Mason Case, Doc. 30 ¶¶ 42, 43, 48, 54.)

[6] *See supra* note 5.

[7] (Buxton Case, Doc. 39 ¶¶ 52, 54; Campbell Case, Doc. 42 ¶¶ 51, 54; Blessing Case, Doc. 41 ¶¶ 52, 54; Chandler Case, Doc. 29 ¶ 53; Mason Case, Doc. 30 ¶¶ 49, 52.)

[8] (Buxton Case, Doc. 39 ¶¶ 41, 58; Campbell Case, Doc. 42 ¶¶ 41, 58; Blessing Case, Doc. 41 ¶¶ 41, 58; Chandler Case, Doc. 29 ¶¶ 41, 57; Mason Case, Doc. 30 ¶¶ 41, 55.)

[9] (Buxton Case, Doc. 39 ¶¶ 45–47; Campbell Case, Doc. 42 ¶¶ 45–47; Blessing Case, Doc. 41 ¶¶ 45–47; Chandler Case, Doc. 29 ¶¶ 45–47; Mason Case, Doc. 30 ¶¶ 44–46.)

Timesharing Act ("FVPTA"), and fraud in the inducement.[10] Defendants move to dismiss all claims.[11] With Plaintiffs' responses,[12] the matter is ripe.

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires a claimant to plead "a short and plain statement of the claim showing that the pleader is entitled to relief"; it does not require "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While "a formulaic recitation of the elements of a cause of action will not do," a complaint satisfies Rule 8(a)(2) if it "give[s] the defendant fair notice of what [the plaintiff's] claim is and the grounds upon which it rests." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). When a complaint is challenged under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and disregards unsupported conclusions of law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (citation omitted).

## III. ANALYSIS

### A. Fraud Claims

Defendants argue Plaintiffs' claims for fraud by omission, fraud in the inducement, and fraudulent misrepresentations under the FVPTA (collectively, "**Fraud**

---

[10] (Buxton Case, Doc. 39; Campbell Case, Doc. 42; Blessing Case, Doc. 41; Chandler Case, Doc. 29; Mason Case, Doc. 30.)

[11] (Buxton Case, Doc. 43; Campbell Case, Doc. 46; Blessing Case, Doc. 45; Chandler Case, Doc. 33; Mason Case, Doc. 34.)

[12] (Buxton Case, Doc. 49; Campbell Case, Doc. 51; Blessing Case, Doc. 52; Chandler Case, Doc. 36; Mason Case, Doc. 37.)

Claims") fail to meet the requirements under Federal Rule of Civil Procedure 9(b) ("**Rule 9(b)**") and are barred by merger clauses and disclaimers in the parties' contracts.[13] The Court addresses each argument.

### 1. Rule 9(b)

Under Rule 9(b), a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). A complaint satisfies Rule 9(b) by alleging:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and
>
> (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and
>
> (3) the content of such statements and the manner in which they misled the plaintiff, and
>
> (4) what the defendants obtained due to the fraud.

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997) (internal quotation marks and citation omitted). When there are multiple defendants, the complaint must "inform each defendant of the nature of his alleged participation in the fraud." *Id.* at 1381 (quotation marks and citation omitted).

The parties agree Rule 9(b) boils down to the who, what, when, where, and how.[14] Plaintiffs have specified the oral misrepresentations and omissions made to them by Sales

---

[13] (Buxton Case, Doc. 43 pp. 5–12; Campbell Case, Doc. 46 pp. 5–12; Blessing Case, Doc. 45 pp. 5–12; Chandler Case, Doc. 33 pp. 5–12; Mason Case, Doc. 34 pp. 5–13.)

[14] (Buxton Case, Doc. 43 p. 5, Doc. 49 p. 3; Campbell Case, Doc. 46 pp. 5–6, Doc. 51 p. 3; Blessing Case, Doc. 45 p. 5, Doc. 52 p. 3; Chandler Case, Doc. 33 p. 5–6, Doc. 36 p. 3; Mason Case, Doc. 34 pp. 5–6, Doc. 37 p. 3.)

Agents, working for Defendants, on specific dates in Orlando, Florida.[15] They allege these statements and omissions convinced them to purchase timeshares and that Defendants have benefited from this purchase.[16] Defendants say this is not enough, arguing Plaintiffs do not specifically identify the speaker of the misrepresentations, only generally allege reliance, and improperly lump together Defendants.[17] The Court is not persuaded.

There are multiple ways to satisfy Rule 9(b) and Plaintiffs' allegations sufficiently put Defendants on notice of the alleged misconduct. *See Brooks*, 116 F.3d at 1371. Plaintiffs have alleged *who* is responsible for the misrepresentations: either identifying the Sales Agents by name or specifying the presentation's date, location, and resulting transaction contract number.[18] Plaintiffs also list the specific statements they relied on in buying timeshares.[19] *Cf. McIntyre v. Marriot Ownership Resorts, Inc.*, No. 13-80184-Civ-SCOLA, 2013 WL 12212640, at *4 (S.D. Fla. Dec. 10, 2013) (finding the plaintiffs failed to satisfy Rule 9(b), in part because they did not identify what statements were made). And Plaintiffs properly allege reliance—claiming they would not have purchased timeshares if not for these misstatements.[20] *See FDIC v. Howard*, No. 3:12-cv-578-J-34JRK, 2013 WL 12097642, at *9–10 (M.D. Fla. Sept. 5, 2013) (finding the plaintiff satisfied reliance under

---

[15] *See supra* notes 5, 7, 8, 9; (Buxton Case, Doc. 39 ¶ 7; Campbell Case, Doc. 42 ¶ 7; Blessing Case, Doc. 41 ¶ 7; Chandler Case, Doc. 29 ¶ 7; Mason Case, Doc. 30 ¶ 7).

[16] *See supra* note 8; (Buxton Case, Doc. 39 ¶ 92; Campbell Case, Doc. 42 ¶ 92; Blessing Case, Doc. 41 ¶ 92; Chandler Case, Doc. 29 ¶ 91; Mason Case, Doc. 30 ¶ 89).

[17] (Buxton Case, Doc. 43 p. 9; Campbell Case, Doc. 46 p. 9; Blessing Case, Doc. 45 p. 9; Chandler Case, Doc. 33 p. 9; Mason Case, Doc. 34 p. 9.)

[18] (Buxton Case, Doc. 39 ¶ 40; Campbell Case, Doc. 42 ¶ 40; Blessing Case, Doc. 41 ¶ 40; Chandler Case, Doc. 29 ¶ 1; Mason Case, Doc. 30 ¶ 1.)

[19] *See supra* notes 5, 7, 8, 9.

[20] *See supra* note 8.

Rule 9(b) by alleging it would not have funded a loan but for the false appraisal).

Plaintiffs' allegations—that they purchased timeshares at specific presentations because

of the Sales Agents' specific misstatements—adequately detail how Plaintiffs were

misled. *See Brooks*, 116 F.3d at 1371.

Defendants also say they are improperly lumped together and cannot determine

their respective alleged misrepresentations.[21] While Plaintiffs list Defendants together

throughout their complaints, this is permissible because Plaintiffs explain how each

Defendant is part of the fraud. *See Raimbeault v. Accurate Mach. & Tool, LLC*, No. 14-CIV-

20136, 2014 WL 5795187, at *12–13 (S.D. Fla. Oct. 2, 2014). Plaintiffs explain WVR is a

subsidiary of WVO, and the Sales Agents are agents of both Defendants.[22] By alleging the

Sales Agents, acting on behalf of both Defendants, made specific false statements to

Plaintiffs in presentations in Orlando, Florida on specific dates, Plaintiffs have satisfied

Rule 9(b).[23] *See Holloway v. Oxygen Media, LLC*, 361 F. Supp. 3d 1213, 1222–23 (N.D. Ala.

2019) (finding Rule 9(b) satisfied when the plaintiff alleged the individuals who misled

her were acting as agents of each Defendant).

---

[21] (Buxton Case, Doc. 43 p. 7; Campbell Case, Doc. 46 p. 7; Blessing Case, Doc. 45 pp. 7–8; Chandler Case, Doc. 33 p. 7; Mason Case, Doc. 34 p. 7.)

[22] (Buxton Case, Doc. 39 ¶¶ 23, 39–40; Campbell Case, Doc. 42 ¶¶ 23, 40; Blessing Case, Doc. 41 ¶¶ 23, 40; Chandler Case, Doc. 29 ¶¶ 23, 40; Mason Case, Doc. 30 ¶¶ 23, 40.)

[23] Defendants also briefly argue Plaintiffs' allegations that Defendants' fraudulent actions are continuing in nature does not make sense. (Buxton Case, Doc. 43 pp. 8–9; Campbell Case, Doc. 46 pp. 8–9; Blessing Case, Doc. 45 p. 9; Chandler Case, Doc. 33 p. 8–9; Mason Case, Doc. 34 pp. 8–9.) While the operative complaints may not be perfect, Plaintiffs have satisfied the requirements of Rule 9(b).

## 2.    Merger Clauses & Disclaimers

Defendants also argue the Fraud Claims should be dismissed because they are barred by merger clauses and disclaimers in the contract.[24] Defendants claim the contracts contradict the alleged oral misrepresentations, so Plaintiffs cannot rely on those misrepresentations.[25] True, merger clauses can ultimately bar relief for claims based on misrepresentations outside a contract. *See, e.g., White Constr. Co. v. Martin Marietta Materials, Inc.*, 633 F. Supp. 2d 1302, 1328 (M.D. Fla. 2009) (granting summary judgment for the defendant on the plaintiff's fraud claim because the plaintiff actively participated in negotiating a contract with a merger clause). But when the plaintiffs claim they were fraudulently induced to enter the contract, the claims are not barred as a matter of law. *See Topp, Inc. v. Uniden Am. Corp.*, 513 F. Supp. 2d 1345, 1349 (S.D. Fla. 2007) (explaining a fraudulent inducement claim can survive a merger clause "if a misrepresentation is made and relied upon inducing the completion of the transaction"). Contracts that allegedly incorporate all representations before the contract was made "do not 'cloak defendants with immunity' from fraudulent statements" when a contract was procured fraudulently. *MeterLogic, Inc. v. Copier Sols., Inc.*, 126 F. Supp. 2d 1346, 1363 (S.D. Fla. 2000) (citations omitted). Plaintiffs allege they relied on Defendants' misrepresentations in entering their contracts,[26] so the merger clauses do not bar their claims as matter of law. *See id.* The Fraud Claims survive.

---

[24] (Buxton Case, Doc. 43 pp. 9–12; Campbell Case, Doc. 46 pp. 9–11; Blessing Case, Doc. 45 pp. 9–12; Chandler Case, Doc. 33 pp. 9–11; Mason Case, Doc. 34 pp. 9–12.)

[25] *See supra* note 24.

[26] *See supra* note 8.

## B.     Unjust Enrichment

Next, Defendants argue Plaintiffs have failed to state claims for unjust enrichment.[27] Plaintiffs allege breach of contract and unjust enrichment in the alternative: if the Court finds a valid contract, the unjust enrichment claim would not move forward; if no valid contract exists, the breach of contract claim would fail.[28] Defendants argue Plaintiffs failed to adequately plead in the alternative because both the breach of contract and unjust enrichment claims rely on the same factual predicates.[29]

Breach of contract and unjust enrichment may be pled in the alternative when one party disputes the validity of the contract. *Martorella v. Deutsche Bank Nat'l Tr. Co.*, 931 F. Supp. 2d 1218, 1227 (S.D. Fla. 2013) (collecting cases). Here, Plaintiffs dispute the validity of their contracts with Defendants.[30] Until the validity of the express contract is proven, dismissal of the unjust enrichment claim is premature. *See Garcia v. Clarins USA, Inc.*, No. 14-CV-21249-HUCK/OTAZO-REYES, 2014 WL 11997812, at *5 (S.D. Fla. Sept. 5, 2014). And since Plaintiffs plead in the alternative, with different allegations in each claim,[31] the claims are not duplicative. *Cf. Silver Crown Invs., LLC v. Team Real Estate Mgm't, LLC*, 349

---

[27] (Buxton Case, Doc. 43 pp. 13–14; Campbell Case, Doc. 46 pp. 12–14; Blessing Case, Doc. 45 pp. 13–14; Chandler Case, Doc. 33 pp. 12–14; Mason Case, Doc. 34 pp. 13–14.)

[28] (Buxton Case, Doc. 39 ¶¶ 91, 103; Campbell Case, Doc. 42 ¶¶ 91, 103; Blessing Case, Doc. 41 ¶¶ 91, 103; Chandler Case, Doc. 29 ¶¶ 90, 102; Mason Case, Doc. 30 ¶¶ 88, 100.)

[29] *See supra* note 27.

[30] (Buxton Case, Doc. 39 ¶ 98; Campbell Case, Doc. 42 ¶ 98; Blessing Case, Doc. 41 ¶ 98; Chandler Case, Doc. 29 ¶ 97; Mason Case, Doc. 30 ¶ 95.)

[31] (*See, e.g.*, Buxton Case, Doc. 39 ¶¶ 92, 105–07; Campbell Case, Doc. 42 ¶¶ 92, 105–07; Blessing Case, Doc. 41 ¶¶ 92, 105–07; Chandler Case, Doc. 29 ¶¶ 91, 104–06; Mason Case, Doc. 30 ¶¶ 89, 102–04.)

F. Supp. 3d 1316, 1333 (S.D. Fla. 2018) (finding unjust enrichment and breach of contract claims duplicative where the plaintiffs did not plead in the alternative and relied on the same facts). So the Court will not dismiss the unjust enrichment claims. *See Martorella*, 931 F. Supp. 2d at 1218.

### C. Breach of Contract

Last, Defendants argue Plaintiffs' breach of contract claims should be dismissed.[32] In Florida, the elements of a breach of contract are: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citation omitted). Plaintiffs allege Defendants breached the duty of good faith and fair dealing and failed to provide Plaintiffs with access to and use of clubs, as represented in their contracts.[33] Defendants say their breach of contract claims should be dismissed because a claim for breach of good faith and fair dealing must be paired with a claim for breach of an express term of the contract, and Plaintiffs have failed to plead breach of an express term.[34] But Plaintiffs allege Defendants violated one or multiple of the following express contract terms: the "Ownership" paragraph, the "Club Accommodations" paragraph, and the "Use and

---

[32] (Buxton Case, Doc. 43 pp. 14–16; Campbell Case, Doc. 46 pp. 14–16; Blessing Case, Doc. 45 pp. 14–16; Chandler Case, Doc. 33 pp. 14–16; Mason Case, Doc. 34 pp. 14–16.)

[33] (Buxton Case, Doc. 39 ¶¶ 102–12; Campbell Case, Doc. 42 ¶¶ 102–12; Blessing Case, Doc. 41 ¶¶ 102–12; Chandler Case, Doc. 29 ¶¶ 101–11; Mason Case, Doc. 30 ¶¶ 99–109.)

[34] *See supra* note 32.

Occupancy" paragraph.[35] Defendants counter these paragraphs impose no duty on Wyndham, but just explain what the contract is about.[36]

Generally, contract interpretation at the motion to dismiss stage is inappropriate. *Cal. Fin., LLC v. Perdido Land Dev. Co.*, 303 F. Supp. 3d 1306, 1310 (M.D. Fla. 2017) (citation omitted); *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1312 (S.D. Fla. 2014) (citation omitted). But the Court may interpret the contract at this early stage if the terms are unambiguous. *Alhassid*, 60 F. Supp. 3d at 1312. "A contract is ambiguous where it 'is susceptible to two different interpretations, each one of which is reasonably inferred from the terms of the contract.'" *Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1252 (11th Cir. 2008) (quoting *Commercial Capital Res., LLC v. Giovannetti*, 955 So. 2d 1151, 1153 (Fla. 3d DCA 2007)). And a contract is unambiguous when one party's interpretation is "unreasonable in light of the contract's plain language." *Id.* (citation omitted).

Both parties' interpretations are reasonable. The paragraphs may just generally describe the timeshare contract arrangement[37] or it may bind Defendants to provide Plaintiffs with access to and use of club accommodations.[38] Construing the complaints in the light most favorable to Plaintiffs, the contracts are ambiguous because there are different reasonable interpretations of the contract terms. *See Novoneuron Inc. v. Addiction*

---

[35] (*See* Buxton Case, Doc. 39 ¶ 109, Doc. 43-1 ¶¶ 1, 4; Campbell Case, Doc. 42 ¶ 109, Doc. 46-1 ¶ 4; Blessing Case, Doc. 41 ¶ 109, Doc. 45-1 ¶ 4; Chandler Case, Doc. 29 ¶ 108, Doc. 33-1 ¶¶ 1, 4; Mason Case, Doc. 30 ¶ 106, Doc. 34-1 ¶ 4.)

[36] *See supra* note 32.

[37] *See supra* note 32.

[38] (Buxton Case, Doc. 49 pp. 11–12; Campbell Case, Doc. 51 pp. 11–12; Blessing Case, Doc. 52 pp. 11–12; Chandler Case, Doc. 36 pp. 11–12; Mason Case, Doc. 37 pp. 11–12.)

*Research Inst., Inc.*, 326 F. App'x 505, 509 (11th Cir. 2009) (per curiam) (finding the district court erred in dismissing a breach of contract claim where there was two reasonable interpretations of the contract). So dismissal is premature. *See Maor v. Dollar Thrifty Auto. Grp.*, 303 F. Supp. 3d 1320, 1326 (S.D. Fla. 2017).

## IV.   CONCLUSION

It is **ORDERED AND ADJUDGED:**

1.   In *Buxton v. Wyndham Vacation Resorts, Inc.*, No. 6:19-cv-1555-Orl-37DCI, Defendants' Motion to Dismiss Third Amended Complaint With Prejudice (Doc. 43) is **DENIED.**

2.   In *Campbell v. Wyndham Vacation Resorts, Inc.*, No. 6:19-cv-1556-Orl-37DCI, Defendants' Motion to Dismiss Third Amended Complaint With Prejudice (Doc. 46) is **DENIED.**

3.   In *Blessing v. Wyndham Vacation Resorts, Inc.*, No. 6:19-cv-1613-Orl-37DCI, Defendants' Motion to Dismiss Third Amended Complaint With Prejudice (Doc. 45) is **DENIED.**

4.   In *Chandler v. Wyndham Vacation Resorts, Inc.*, No. 6:19-cv-1647-Orl-37DCI, Defendants' Motion to Dismiss First Amended Complaint With Prejudice (Doc. 33) is **DENIED.**

5.   In *Mason v. Wyndham Vacation Resorts, Inc.*, No. 6:19-cv-1648-Orl-37DCI, Defendants' Motion to Dismiss First Amended Complaint With Prejudice (Doc. 34) is **DENIED.**

**DONE AND ORDERED** in Chambers in Orlando, Florida, on April 22, 2020.

ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record

DocuSign Envelope ID: B64183D0-6F16-41ED-B27E-6514CA0DCF66

This is a copy view of the Authoritative Copy
by this document's custodian.

||||||||2222222222222

## SECURITY AGREEMENT

| | |
|---|---|
| Member Number | 00203660990 |
| Contract Number | 00019-1902720 |
| Contract Date | 12-19-2019 |

### CLUBWYNDHAM® ACCESS VACATION OWNERSHIP PLAN
### RETAIL INSTALLMENT CONTRACT
### PURCHASE AND SECURITY AGREEMENT
### (Tennessee)

Wyndham Vacation Resorts, Inc., a Delaware corporation (*"Seller"*), agrees to sell to CHARLES HAROLD BEDGOOD and LINDA LYNN BEDGOOD HUSBAND AND WIFE (*"Owner"*) a membership interest (*"Ownership"*) in PTVO Owners Association, Inc., a non-stock, non-profit Delaware corporation (*"Association"*), which Ownership includes the right to participate in the ClubWyndham Access Vacation Ownership Plan (*"Club"*) and the right to use and occupy Club Accommodations. If more than one person executes this Agreement as Owner, the liability of each Owner under this Agreement shall be joint and several. Seller and Owner may hereinafter be referred to collectively as the (*"Parties"*) or individually as a (*"Party"*). These rights are denominated in Points and Owner agrees to purchase the Ownership for a purchase price of $23,000.00 (the *"Purchase Price"*) on the following terms and conditions:

Points consisting of the following:

Perpetual Points:   **154,000**       Annual   **X**       Biennial ___

*"Initial Use Year"*:   **January 1st through December 31st**.

### A. BENEFITS AND NATURE OF OWNERSHIP

**1. Ownership.** Owner is a member of the Association, and is entitled: (a) to use Points to reserve the use of accommodations in the Club (*"Club Accommodations"*), (b) to vote for directors of the Association, (c) to vote on major decisions of the Association, and (d) through the Club and the Association, to participate in the ownership of the assets of the Association. At the Closing of the purchase of the Ownership as set forth in Section 40 below, (i) Owner will receive an Ownership Certificate evidencing the Ownership (which will delineate, among other things, Owner's Points), and (ii) Owner's name and the other information concerning the Ownership will be entered into the permanent records of the Association (*"Club Ownership Register"*). The Seller is Wyndham Vacation Resorts, Inc., 6277 Sea Harbor Drive, Orlando, Florida 32821. Owner is purchasing a timeshare use timeshare interest in a non-specific, multi-site timeshare plan called ClubWyndham Access Vacation Ownership Plan. The address of this timeshare plan is 6277 Sea Harbor Drive, Orlando, Florida 32821. Refer to the ClubWyndham Access Public Offering Statement (*"Public Offering Statement"*) accompanying this Agreement for a list of Club Accommodations which are under construction (if any) and estimated completion dates.

**2. Duration of Ownership.** Ownership shall be effective from the date on which the Closing described in Section 40 below occurs and Owner may use Points to obtain reservations and other Club benefits starting with Owner's Initial Use Year as set forth above. Ownership shall be perpetual.

**3. Right of First Refusal.** Pursuant to Section 9.5 of the Second Amended and Restated Declaration of Covenants, Conditions and Restrictions and Grant and Reservation of Easements for ClubWyndham Access Vacation Ownership Plan (*"Declaration"*), Seller has reserved the right of first refusal upon any sale of an Ownership, provided however, that no right of first refusal shall exist with regard to a transfer of Ownership by will or devise, or as a result of a gift or conveyance for nominal consideration (defined to mean less than $100). Before Owner may resell the Owner's Ownership to a third party and for so long as Seller offers Ownerships for sale to the general public, Owner is required to offer the Owner's Ownership to Seller upon the same terms and conditions, including financing, as is offered by or to the third party. Accordingly, upon any proposed sale of Owner's Ownership, Owner must notify Seller in writing of the Owner's intent to sell the Ownership and must include a copy of the proposed transaction reduced to writing in all respects, including a copy of the written offer stating the name or names of the transferee(s), their address(es) and the exact terms of the sale, including the consideration, if any, which Owner is to receive for the sale of the Ownership. Upon receipt of such written notice, Seller will have a period of thirty (30) days within which to notify the Owner whether or not Seller intends to exercise its right of first refusal. If Seller elects to exercise its right of first refusal, Seller shall notify Owner in writing of such election, and Seller shall thereafter acquire the Vacation Ownership on the exact same terms as described in the written offer. If Seller fails to notify Owner of its election to exercise its right of first refusal within the thirty (30) day period or if Seller responds that it is not exercising its right of first refusal, then Owner shall thereafter be free during the succeeding sixty (60) days to consummate the transaction exactly as described in the written offer. If the transaction is not so consummated within said sixty (60) days or should the terms of the transaction change, then Seller's right of first refusal would again apply to such Ownership and any proposed sale with respect thereto. Seller's right of first refusal is a continuing right and shall survive any sale involving an Ownership so as to apply to any successor's proposed sale with respect to that Ownership.

ClubTN                        Page 1 of 10                        No. 2008/Rev. 5-19

*Exhibit E*

DocuSign Envelope ID: B641B3UU-6F16-41ED-B27E-8514CAUUCF58

This is a Reproduction of the Authoritative Copy
By the clie...**2222222222222222**

Contract Number: 00019-1902720

**4. Transferability of Ownership.** Subject to Seller's right of first refusal described in Section 3 above and the terms and provisions of the Declaration, the Ownership (and the Points) may be transferred entirely or partially at any time during their term and without limitation to the number of transfers, through sale, gift, inheritance, dissolution of marriage, or by any operation of law, subject to the following terms: (a) reasonable Ownership transfer fee has been paid to the Association; (b) all payments or charges due the Association, Seller or any Holder or Co Holder (as those terms are defined in Section 17) of this Agreement are current; (c) the Points transferred and the Points retained, if any, must each be enough Points to satisfy the then Minimum Points Requirement as established by Seller; (d) the Association must consent to the transfer which consent shall not be unreasonably withheld, conditioned or delayed; (e) the transfer must be entered in the Club Ownership Register; (f) all aspects of the transfer must comply with applicable law; and (g) if any financed amounts are still owing to Seller or to any Holder or Co-Holder, (i) the Owner must obtain the written consent of the Seller or any Holder or Co-Holder to such proposed transfer which consent shall not be unreasonably withheld, conditioned or delayed, (ii) the transferee must satisfy the then current credit requirements of the Seller or any Holder or Co-Holder, and (iii) transferee may be charged a financing transfer fee. Owner and Seller each acknowledge and agree that Seller has entered into this Agreement in consideration of and reliance upon the creditworthiness and reliability of Owner.

## B.   ACCOMMODATIONS AND OTHER MATTERS

**5. Club Accommodations.** Owner shall have access to all existing and future Club Accommodations and the properties within which those Club Accommodations are located (*"Club Properties"*), as well as all other accommodations owned or operated by or associated with Club, wherever located. Provided however the location and specific nature of the Club Accommodations shall be subject to change in accordance with the Club Instruments (as defined below).

**6. Participation of Owner in Association Governance.** The Articles of Incorporation, By-laws, Regulations of the Association and the Declaration provide, among other things, for: (a) meetings of, and votes by the Parties who hold Ownership in the Association (called *"Owners"*), (b) election of directors, and (c) use rights in Club Accommodations.

**7. Control of Club Accommodations by the Association.** The Association or one or more Trusts each of whose beneficiary is the Association, shall hold the deed or the lease to each Club Accommodation, free of the effects of debt encumbrances (or with a non-disturbance agreement in place), and subject to the Declaration which, among other things: (a) is recorded or filed against each Club Accommodation, (b) provides for dedication of the Club Accommodation to the Club; and (c) establishes the Points as the currency of use in the Club. Notwithstanding the Association's or a Trust's ownership of Club Accommodations in the various Club Properties, in many instances, not all of the accommodations at a Club Property will be or become Club Accommodations and therefore, the Association will have limited, if any, right to control that Club Property.

**8. Power of Attorney.** The power to direct the Trustee as to all matters shall be exercised solely by the Association and by the Seller acting in accordance with the Club Instruments. The Association and the Seller may exercise that power of direction without the consent of the Owner. To the extent that the joinder of the Owner may be required to validate any act or thing done by the Association or the Seller pursuant to this power of direction, each Owner, by entry in the Club Ownership Register, grants to the Association and to the Seller a special power of attorney for these purposes, to the extent permitted by applicable law, coupled with an interest that cannot be revoked as set forth in Section 7.5 of the Declaration.

**9. The Club.** The Club is governed by, among other things, the Declaration, the Articles of Incorporation and By-laws for the Association; Trust Agreements, if any; and the regulations, as each may be lawfully amended or supplemented from time to time (all such governing documents, as so amended, *"Club Instruments"*). In addition, because many Club Accommodations may be located within Club Properties that are themselves operated as condominiums or timeshare programs, those Club Accommodations are subject to declarations, articles of incorporation and by-laws for the association managing such property and the rules and regulations of the condominium and/or timeshare programs being operated thereon (*"Club Property Instruments"*). The Club Instruments, together with the Club Property Instruments, will govern many aspects of ownership, use and operation of the Club and the Club Accommodations, including, without limitation, (a) reservations; (b) the number of persons permitted to occupy each Club Accommodation; (c) guest policies; (d) fees; (e) rental of Club Accommodations by Owners and by the Club and others; (f) charges for use of specific facilities at each Club Property; (g) personal conduct and behavior; (h) check-in and check-out times; and (i) care and maintenance of Club Accommodations and related facilities and amenities. The Ownership conveyed by this Agreement shall be held by Owner subject to each of the provisions of the Club Instruments and the Club Property Instruments.

**10. Development and Management of Club.** Seller has developed the Club and has caused accommodations in Club Properties to be transferred to the Association or a Trust for the benefit of the Association in exchange for the proceeds of sale as well as exclusive marketing rights, and the right to add additional properties. Pursuant to a Management Agreement between Seller and/or one or more affiliates of Seller, and the Association, Seller or such affiliate will also manage the Club, the Association and those Club Properties which are not part of other timeshare or condominium programs.

## C.   POINTS USE

**11. Club Program.** The benefits and obligations of Ownership are determined by the number and types of Points assigned to the Ownership.

(a) Use. Points may be used to reserve Club Accommodations that are available through the Club on a space available basis. The number of Points required for occupancy of any Club Accommodation will be based on numerous factors, including, without limitation, the season, location, unit size and type, and day of the week.

ClubTN                                   Page 2 of 10                              No. 2008/Rev. 5-19

Docusign Envelope ID: B64163L00-8F16-41ED-B27E-6514LA00CP68



Contract Number  00019-1902720

(b) **Issuance.** Points are renewed annually (or, in the case of Biennial Points, every other year) throughout the term of the Ownership, at the beginning of Owner's Use Year, in the total number of Points purchased by Owner.

(c) **Additional Points.** Owner may purchase additional Points from Seller at any time after the date of this Agreement, subject to the following: (i) the Points are available; (ii) Owner is not in default under this Agreement; (iii) the Owner is in good standing with the Association; (iv) the then current price is paid; and (v) if Seller finances the purchase, Owner satisfies Seller's then current credit requirements.

### D.  QUALIFICATIONS AND CONDITIONS TO PURCHASE ASSOCIATION MEMBERSHIP

**12. Legal Capacity.** Owner represents that Owner is a person or entity with the legal capacity to enter into this Agreement.

**13. Non-Investment Purchase.** Owner represents that Owner is purchasing an Ownership for the purpose of recreational and social use, and not for financial profit.

### E.  CONTRACTUAL STANDARDS

**14. Liability Limitations.** Owner agrees that Owner and Owner's family or guests assume all risks of loss or damage to persons or property in using the Club Accommodations and the Club Properties in which they are located, except that this limitation of liability shall not apply in cases of negligence of the Seller, Manager or Association.  Owner also agrees to maintain liability and property damage insurance in connection with any motor vehicle(s) brought to the Club Accommodations, in amounts customarily carried on such vehicle(s).

**15. Owner Default.** Owner shall be in default under this Agreement if Owner fails to pay on time, keep any promise, or fulfill any agreement or obligation contained herein or in any of the documents or instruments referenced herein. Without limiting the scope of the prior sentence, obligations include obtaining the written consent of Seller or any Holder or Co-Holder to transfer any part of the Ownership which is subject to outstanding amounts financed and owed to Seller or any Holder or Co-Holder. In the event of a default by Owner, Owner shall not be entitled to reserve, use, or occupy any Club Accommodation, or to exercise any other rights, benefits, or privileges appurtenant to Owner's Ownership.

(a) Owner's default in the performance of any of Owner's obligations under this Agreement on or before Closing shall entitle Seller to terminate this Agreement immediately and all of Owner's rights, benefits, and privileges hereunder.  Upon such termination, Seller shall cause Escrow Agent to deliver to Seller, all sums of money previously paid by Owner hereunder as liquidated damages and not as a penalty as Seller's exclusive remedy for Owner's default.  To the extent Owner has paid any assessments or other amounts to the Association prior to Closing, those amounts shall also be forfeited and retained by the Association.

(b) If Owner fails to timely perform any of Owner's obligations under this Agreement or the Club Instruments after Closing, Owner shall be in default and Seller or any Holder or Co-Holder may enforce the Seller Security Interest (as described in Section 16 of this Agreement) against Owner's Ownership (and the proceeds thereof) in accordance with this Agreement.  Upon the occurrence of any such failure, Seller or any Holder or Co-Holder shall give Owner written notice thereof and if Owner has not cured the applicable failure within thirty (30) days after Seller or any Holder or Co-Holder gives such notice, Owner shall be in default under this Agreement and Seller or any Holder or Co-Holder may enforce the Seller Security Interest in accordance with Section 16 below.

**16. Remedies/Security Interest.** To secure compliance with Owner's obligations hereunder, Owner hereby grants to Seller and any Holder or Co-Holder a security interest (*"Seller Security Interest"*) in the Ownership purchased under this Agreement and all proceeds therefrom (collectively the *"Collateral"*). The Seller Security Interest constitutes a lien on the Collateral. The Seller Security Interest and lien shall remain in effect as long as there are obligations of Owner in favor of Seller or any Holder or Co-Holder to be fulfilled under this Agreement. No waiver by Seller, the Association, or any Holder or Co-Holder of this Agreement of any default or breach by Owner shall operate as a waiver of the same or any other default or breach by Owner or any other Party listed as Owner in the future. Each Owner signing below hereby appoints each other Owner signing below as his or her agent for dealing with Seller and any Holder or Co-Holder of this Agreement for any purpose. Upon the occurrence of a default described in Section 15 above, Seller or any Holder or Co-Holder of this Agreement may choose, to the extent permitted by applicable law, one or more of the following remedies: (a) declare the entire unpaid balance of the Purchase Price and Processing Fee immediately due and payable, unless prohibited by law; (b) foreclose the lien created by the Seller Security Interest and sell or retain the Ownership in satisfaction of Owner's obligations hereunder, or exercise any other right under Article 9 of the applicable Uniform Commercial Code; (c) terminate the Ownership and retain all amounts previously paid by Owner as compensation for damages incurred in proceeding pursuant to this Agreement (Seller and Owner agree that in such case it would be impractical or extremely difficult to fix the actual damage and therefore, the amounts previously paid by Owner are a fair and reasonable estimate of Seller's actual damages for such default); (d) suspend use rights, including, but not limited to, cancelling any existing and future reservations; (e) sue for the unpaid balance due hereunder; (f) deny request to transfer Owner's Ownership and Points in the Club Ownership Register; and/or (g) pursue any other remedy allowed by law, except Seller cannot terminate this Agreement or foreclose against the Ownership without the consent of the Holder or Co-Holder of any right to the unpaid balance due hereunder.

**17. Additional Creditor.** The right to receive payment of the Purchase Price and Processing Fee under this Agreement belongs to Seller, but could be assigned, collaterally or absolutely, to another creditor (such creditor is referred to herein as a *"Holder"* or *"Co-Holder"*). This Agreement, together with all security interests, rights of enforcement and payment due hereunder, is freely assignable by Seller, its successors and assigns.

DocuSign Envelope ID: B6415300-6F1B-4FED-B27E-8614CA0DCF88

This is a copy, view of the Authoritative Copy for the de **IHIIH2222222222222222**

Contract Number:  00019-1902720

## NOTICE:

**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR (OWNER) COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF.   RECOVERY HEREUNDER BY THE DEBTOR (OWNER) SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR (OWNER) HEREUNDER.**

**18. General Provisions.** Except as otherwise set forth under Section 46 entitled "Purchaser's Nonwaivable Right to Cancel" below, any written notice required or desired to be given hereunder shall be deemed given when personally delivered or after three (3) days deposit in the U.S. Mail, first class postage prepaid or one (1) day after acceptance by a nationally recognized overnight courier service, addressed to the address given herein or such subsequent address as is given by proper notice or when sent by facsimile to any facsimile number given by one Party to the other. This Agreement, and any and all other documents executed at the same time as this Agreement, constitutes the entire agreement between the Parties hereto. No representation or warranties, oral or written, other than the representations set forth in this Agreement and the Ownership Plan, any and all other documents executed at the same time as this Agreement and the Ownership Plan, have been relied upon by the Parties. Except as otherwise provided herein, this Agreement shall be binding upon and benefit the heirs, executors, administrators and successors of each of the Parties. If any provision of this Agreement shall be found to be invalid, the remaining provisions shall nevertheless remain in full force and effect. Unless terminated in accordance with the terms of this Agreement, this Agreement shall survive the closure of the Ownership and the Ownership Certificate and the registration thereof in the Club Ownership Register and shall survive the final payment toward the purchase hereunder.

**19. Owner Responsibility.** Transfer or abandonment of the Ownership does not relieve Owner of Owner's obligations hereunder unless such transfer or abandonment of the Ownership is agreed to by the Association, Seller and/or any Holder or Co-Holder of any right to the unpaid balance due under this Agreement.

**20. Communications with Owner.** Owner hereby expressly consents and agrees that the Association, Seller, and Seller's parent, subsidiaries, affiliates, successors, or assigns may use written, electronic or verbal means to contact Owner. This consent includes, but is not limited to, contact by manual calling methods, prerecorded or artificial voice messages, text messages, emails and/or automatic telephone dialing systems. Additionally, Owner hereby agrees that the Association, Seller, and Seller's parent, subsidiaries, affiliates, successors, or assigns may use any email address or any telephone number Owner provides, now or in the future, including a number for a cellular phone or other wireless device, regardless of whether Owner incurs charges as a result.

**21. Modifications and Changes.** Seller reserves the right to make changes in the Club Instruments for the purpose of correcting errors in the preparation and filing of all documents relating to the Club where necessary to establish the validity and enforceability of the Club Instruments. Seller reserves the right to add additional real property interests to the Club as provided in the Club Instruments. Seller further reserves the right to make clerical or typographical corrections in any documents related to this Agreement.

### F.  ASSESSMENTS - ASSOCIATION'S SECURITY INTEREST

**22. Regular Assessments.** The current annual Regular Assessment for Owner's Ownership is $922.46 (U.S. Funds), based on the formula and rate of annual Regular Assessments currently established by the Association pursuant to the Club Instruments. Regular Assessments may be increased annually subject to the Club Instruments.  Regular Assessments shall be used for Club Costs, including maintenance and operation of Club Accommodations (including for reserves) and operation and management of the Club, all as more particularly described in the Club Instruments.

**23. Special Assessments and Taxes.** The Association may levy special assessments subject to the Club Instruments. The Owner is also responsible for any tax that might be assessed by a civil taxing authority on the purchase of Owner's Ownership or the use of any Club Accommodations.

**24. Individual Charges.** Owner must pay separately for extra benefits including, but not limited to, if available, food, storage, extra maid service, purchase of goods, use of equipment, furnishings or facilities not normally provided as part of the Club Accommodation or the Club Property in which it is located, and exchange program services if available.

**25. No Warranties.** SELLER MAKES NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY CONCERNING THE CLUB ACCOMMODATIONS OR CLUB PROPERTIES, INCLUDING ANY WARRANTIES, STATUTORY OR OTHERWISE, OF HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT AS MAY BE REQUIRED BY LAW AS OF THE DATE HEREOF.  ACCORDINGLY, ANY REPAIRS TO THE CLUB ACCOMMODATIONS OR CLUB PROPERTIES NOT COVERED BY RESERVES MAY RESULT IN A SPECIAL ASSESSMENT.

**26. Damage Charges.** Owner must pay, as an Individual Charge, any cost of repair or replacement for any damage caused by Owner, Owner's family or guests, or anyone else that Owner allows or permits to occupy a Club Accommodation during Owner's reserved use period.

ClubTN

No. 2008/Rev. 5-19

Docusign Envelope ID: B64763DD-6F16-41ED-82F7E-8514LA00CF68

Contract Number: 00019-1902720

**27. Association's Remedies/Security Interest.** To secure compliance with the Club Instruments, Owner hereby grants to the Association a Security Interest (the *"Association Security Interest"*) in Owner's Ownership and all proceeds thereof (i.e., the Collateral), which Association Security Interest is subject to and subordinate to the Seller Security Interest. The Association Security Interest shall remain in effect as long as Owner's Ownership remains in effect. Upon a breach by, or failure of, Owner to perform any of Owner's obligations under the Club Instruments, which breach or failure extends beyond any notice, cure and/or grace periods specifically provided for in the Club Instruments, the Association may, among other things (the Club Instruments describe all of the Association's rights and remedies for an Owner default thereunder: (a) foreclose the lien provided by the Association Security Interest, subject to any Seller Security Interest then in existence, and sell or retain Owner's Ownership in satisfaction of Owner's obligations to the Association or exercise any other right under Article 9 of the applicable Uniform Commercial Code; (b), if the Seller Security Interest no longer exists, terminate the Ownership; (c) suspend the Owner's rights to use the Points ascribed to Owner's Ownership and in certain instances, the Owner's rights to occupy a Club Accommodation for which the Owner had previously obtained a reservation; (d) sue the Owner personally for all amounts due to the Association; (e) deny request to transfer Owner's Ownership and Points in the Club Ownership Register; and/or (f) pursue any other right or remedy allowed by law, subject, however, to the Seller Security Interest (if still in effect) and subject to the terms and provisions of the Club Instruments.

### G. PURCHASE PRICE, FINANCE CHARGE, AND PAYMENTS

**28. Purchase Price.** Owner agrees to pay Seller the Purchase Price in U.S. Funds (less other Credits/Discounts) together with a Closing Fee (as described below), a document processing fee (*"Processing Fee"*) described in Section 30 below and the credit service charge (*"Finance Charge"*) as described in Section 31 Credit Terms. Payments shall be credited first on the interest then due, then on principal. Interest will begin to accrue on the day after the Contract Date. This Installment Contract provides for an interest rate of ZERO    0/10 (0.00%) per annum.  This amount is required to be included in the calculation of the Annual Percentage Rate and Finance Charge. The Finance Charge described as interest herein constitutes a time-price differential under Tennessee law.

**29. Closing Fee.** Owner agrees to pay a $25.00 Closing Fee, which Seller will pay to First American Title Insurance Company.

**30. Processing Fee.** Owner understands and agrees to pay Seller a Processing Fee of $349.00 which is charged to all Owners, whether paying in cash or buying on credit to cover various processing services related to the sale, including administration and preparation of various documents related to the sale. These services are separate and distinct from the services that Seller performs as settlement agent. Together, the Purchase Price, Processing Fee, Closing Fee and Finance Charge constitute the (*"Total Sale Price"*).

[REMAINING PAGE INTENTIONALLY LEFT BLANK]

DocuSign Envelope ID: B64183D0-6F16-41ED-B27E-651NCA00CF66

This is a copy view of the Authoritative Copy held by the DocuSign System: **INHH2222222222222**

Contract Number: **00019-1902720**

**31. Credit Terms.** Disclosures Required By: Federal Truth In Lending Act, and State Law. Creditor: WYNDHAM VACATION RESORTS, INC. 6277 Sea Harbor Drive, Orlando, Florida 32821.

| ANNUAL PERCENTAGE RATE<br><br>The cost of your credit as a yearly rate: | FINANCE CHARGE<br><br>The dollar amount the credit will cost you: | Amount Financed<br><br>The amount of credit provided to you or on your behalf: | Total of Payments<br><br>The amount you will have paid after you have made all payments as scheduled: | Total Sale Price<br><br>The total cost of your purchase on credit including your down payment of: |
|---|---|---|---|---|
| 0.00% | $0.00 | $0.00 | $0.00 | $23,349.00:<br>$23,349.00 |

Your payment schedule will be:

| Maximum No. of payments: | Amount of Each Payment: | Payments are due monthly, on the same date each month |
|---|---|---|
| 1 | $0.00 | Beginning: 02-02-2020 |

AP: $3,375.00   Contract No. 000051919140   .   TE: $3,375.00

Late Charge: Owner will be charged a late charge of $5.00 or the maximum permitted by applicable law for each payment that is more than ten (10) days late.

Security Interest: Owner is giving the Seller and the Association a security interest in the Ownership being purchased and all proceeds therefrom.

Prepayment: If Owner prepays the balance due, there will be no penalty.

Auto Pay Rate: Did Owner Enroll in the Auto Pay Plan using Owner's checking or savings account (*"APP"*)? ___ Yes _X_ No. If "Yes" is checked, the following applies. By enrolling in the APP using Owner's checking or savings account, Owner's Annual Percentage Rate disclosed above reflects a reduction of one-half percent (½%) (the *"Reduction"*) over the Annual Percentage Rate that would otherwise apply. The Annual Percentage Rate disclosed above will automatically increase by the amount of the Reduction in the event any one of the following occurs: (a) Owner discontinues participation in the APP, (b) Owner's financial institution is unable or unwilling to participate, or (c) Seller or any Holder or Co-Holder discontinues Owner's participation for reasonable cause. Any increase in the Annual Percentage Rate will take the form of higher payment amounts. For example, if Owner's loan was for $10,000.00 at 17.49% for 7 years and the rate increased to 17.99%, Owner's regular payment would increase by approximately $5.00.

Contract Reference: Owner should refer to this Agreement for information about nonpayment, default, the right to accelerate maturity of Owner's payment obligation, prepayment rebates and penalties, and other creditor remedies.

| ITEMIZATION OF AMOUNT FINANCED | | | |
|---|---|---|---|
| 1. Gross Purchase Price: | $ 39,000.00 | 6. Closing Fee (Paid to Escrow Agent): | $ 25.00 |
| 2. Discounts/Other Credits: | $ 16,000.00 | 7. Total Cash Price (Lines 3+4+5+6): | $ 23,374.00 |
| 3. Net Purchase Price (Paid to Seller): | $ 23,000.00 | 8. Down Payment From Trade In: | $ 3,375.00 |
| 4. Processing Fee (Paid to Seller): | $ 349.00 | 9. Down Payment: | $ 19,974.00 |
| 5. State and Local Taxes: | $ 0.00 | 10. Total Down Payment (Lines 8+9): | $ 23,349.00 |
| | | 11. Amount Financed (Lines 7-6-10): | $ 0.00 |

[REMAINING PAGE INTENTIONALLY LEFT BLANK]

DocuSign Envelope ID: 864163C0-6F16-41ED-B27E-6514C4D0CF68

Contract Number:  00819-1902720

**32. Change in Law.**  If a law, which applies to this Agreement and which sets maximum finance charges, is finally interpreted so that the interest or other charges collected or to be collected in connection with this Agreement exceed the permitted limits, then: (i) any interest and/or other charges will automatically be reduced by the amount necessary to reduce the interest rate and/or charges to the permitted limit, retroactively effective as of the date of this Agreement, and as though this Agreement originally provided for the reduced interest rate, finance and/or other charge, as the case may be; and (ii) any sums already collected from Owner which exceeded permitted limits will be refunded to Owner. The Holder or Co-Holder may choose to make this refund by reducing the principal Owner owes under this Agreement or by making a direct payment to Owner. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**33. Other Charges.**  The Association, the Seller and any Holder or Co-Holder each have the right to collect charges per dishonored check or other form of payment up to the maximum amount permitted by applicable law. For any late or missed payments, in addition to any applicable late charges, and to the extent permitted by law, Owner may also be charged a service or administrative fee to compensate for the added expense, administrative burden, and inconvenience caused by the delay in such payment. Additionally, to the extent permitted by law, Owner may also be charged any costs and expenses incurred in the attempted collection of any delinquent payments, including, without limitation, reasonable collection fees, which may be based on a percentage amount over and above the delinquent payments.

### H. DISPUTE RESOLUTION/ARBITRATION

**PLEASE READ THIS PROVISION OF THE AGREEMENT CAREFULLY. IT PROVIDES THAT CERTAIN DISPUTES MUST BE RESOLVED BY BINDING ARBITRATION. IN ARBITRATION YOU GIVE UP THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN COURT PROCEDURES, AND ARE SUBJECT TO VERY LIMITED REVIEW.**

**34. Dispute Resolution/Arbitration.**  Any Disputes between the Parties shall be resolved as follows:

(a) **Definition of Disputes.**  The Parties agree that any dispute, claim, suit, demand or controversy arising out of or relating to this Agreement (any "*Dispute*") shall be determined exclusively and finally by individual arbitration, except as specified below. "Dispute" includes, without limitation, any claim regarding any breach, termination, enforcement, interpretation or validity of this Agreement, any claim arising out of or related to the marketing, purchase, and/or use of Owner's Ownership, Owner's use of Seller's properties, and/or Owner's participation in any activities/events sponsored, organized, or made available by Seller or any of its affiliates.

(b) **Neutral Arbitrator/No Jury.**  Any Dispute will be submitted to a neutral arbitrator, for a final and binding determination, known as an award. The arbitrator is an independent decision maker, appointed by the American Arbitration Association ("*AAA*"), who reviews and weighs evidence provided by both Parties, and issues an award enforceable in court. Decisions by an arbitrator are subject to very limited review by a court. Except as expressly provided below in this Dispute Resolution/Arbitration clause, the Parties waive and relinquish any and all rights to have a court or a jury resolve any Dispute.  **The Parties expressly waive any right to a jury trial.**

(c) **Individual Basis/No Class Actions.**  The Parties expressly intend that any Disputes will be arbitrated on an individual basis. There will be no right or authority for any Dispute to be arbitrated or litigated in any way on a class, mass, or other collective basis, and the Parties waive any right to bring or join any representative or other claim brought on behalf of the general public, other purchasers, or other persons similarly situated.

(d) **Certain Carve-Outs.**  Despite this arbitration provision, the Parties reserve certain rights to proceed in court without waiving their right to arbitrate under this Dispute Resolution/Arbitration provision: (1) Seller reserves the right to seek emergency injunctive relief from a court to address any circumstances or behavior, by Owner or any person who obtained or is using Owner's rights and privileges, that Seller believes may present a risk or threat to the safety, security or reputation of any resort, guests, reservation system, data system, or other feature or location connected with Seller; (2) Owner reserves the right to file a Dispute in small claims court in Florida, as long as the matter remains in small claims court and proceeds only on an individual basis; and (3) No provision of this Dispute Resolution/Arbitration provision shall limit the right of any Party to seek and use any available remedies, judicial or otherwise, for the purpose of foreclosing upon, or accelerating any debt secured by any property that is involved in any Dispute or subject to any Note, Promissory Notes, Mortgage Deed or Mortgage (the "*Loan Documents*") executed by the Parties. Any such acceleration, or foreclosure, process shall be governed by the terms of the Loan Documents and applicable foreclosure law and procedures may occur outside the arbitration process if either of the Parties so elects, and shall not be deemed a waiver of the right to arbitrate any other issue involved in a Dispute.

DocuSign Envelope ID: BB4163D0-6F1B-41ED-B27E-6614CA00CF58

This is a copy view of the Administrative Copy
by the ... INUM2222222222222

Contract Number:  00019-1902720

(e) **Applicable Rules/Location.**  This arbitration agreement is governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.). The arbitration shall be administered by the AAA under its Consumer Arbitration Rules, available online at www.adr.org or by calling the AAA at 1-800-778-7879 (the "**AAA Rules**"), except that the Parties expressly agree that the AAA Supplementary Class Rules shall not apply, given the express class waiver above, and further agree that Rules 14(a) and 53 of the Consumer Arbitration Rules shall not authorize any arbitrator or court to find that any class, mass, collective or representative claim may be arbitrated. The arbitration shall be held in the County of Orange, State of Florida unless the Parties agree to another location in writing, or the arbitrator decides to hold a telephonic hearing to reach a decision based solely on the Parties' submission of documents, or to designate another location reasonably convenient for the Parties. In the event of any conflict between the AAA Rules and this Agreement, the provisions of this Agreement shall be controlling.

(f) **Stay of Proceedings.**  In the event that a Dispute involves both issues that are subject to arbitration and issues that are not subject to arbitration, the Parties unequivocally agree that any legal proceeding regarding the issues not subject to arbitration shall be stayed pending resolution of the issues subject to arbitration, except for any proceedings described in Paragraph 34(d) above, which actions shall proceed without a stay.

(g) **Final and Binding.**  The arbitration award shall be final and binding on the Parties. Judgment on the arbitrator's award may be entered in any state or federal court of competent jurisdiction.

(h) **Payment of Fees.**  The payment of all fees for registration, filing and administration of the arbitration, and the payment of arbitrator fees, shall be governed by the AAA Rules and applicable law, unless otherwise stated in this Agreement. The Parties shall bear their own legal fees and legal expenses for any arbitration proceeding.

(i) **Notice and Good Faith Negotiation.**  Any Party intending to file an arbitration demand against the other Party must notify the other Party at least thirty (30) days before filing. The Parties agree to attempt to negotiate a mutually agreeable resolution to resolve any such dispute or claim during this period. If a Party filing an arbitration demand fails to provide that notice, the other Party is entitled to seek a stay of the arbitration proceeding from the AAA for thirty (30) days and to participate in settlement negotiations during that period in good faith.

**35. Complete Waiver of Jury Trial.**  TO THE EXTENT A CLAIM BY ONE OF THE PARTIES AGAINST THE OTHER PARTY IS NOT SUBJECT TO THE ARBITRATION PROVISION IN SECTION 34 OR TO THE EXTENT AN OTHERWISE ARBITRABLE DISPUTE IS LITIGATED IN COURT, THE PARTIES HEREBY UNCONDITIONALLY WAIVE ANY RIGHT TO A JURY TRIAL OF ANY AND ALL SUCH CLAIMS, DISPUTES, OR CAUSES OF ACTION, WHETHER NOW EXISTING OR HEREAFTER ARISING, OF ANY KIND. EACH OF THE PARTIES HEREBY AGREES THAT THE PARTIES MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE WAIVER OF ANY RIGHT TO TRIAL BY JURY.

**36. Complete Waiver of Class Action.**  TO THE EXTENT A CLAIM OR DISPUTE IS NOT SUBJECT TO THE ARBITRATION PROVISION IN SECTION 34 OR TO THE EXTENT AN OTHERWISE ARBITRABLE DISPUTE IS LITIGATED IN COURT, THE PARTIES AGREE TO WAIVE ANY RIGHT TO PARTICIPATE IN A CLASS, MASS, OR OTHER COLLECTIVE ACTION, AND THE PARTIES WAIVE ANY RIGHT TO BRING, JOIN, OR PARTICIPATE IN ANY REPRESENTATIVE OR OTHER CLAIM BROUGHT ON BEHALF OF THE GENERAL PUBLIC, OTHER PURCHASERS, OR OTHER PERSONS SIMILARLY SITUATED.

**37. Governing Law.**  The Parties agree that this Agreement evidences a transaction involving interstate commerce so as to ensure the applicability of the Federal Arbitration Act ("**FAA**"). In the event of a conflict between applicable state law and the FAA, the FAA shall govern. If any portion of this Agreement is deemed invalid or unenforceable, the remainder of the Agreement shall remain in force.

**38. Limitation of Liability.**  OWNER EXPRESSLY AGREES THAT IN NO EVENT SHALL SELLER, ITS PARENT, SUBSIDIARIES, AFFILIATES, SUCCESSORS, OR ASSIGNS BE LIABLE TO OWNER FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR ENHANCED DAMAGES ARISING OUT OF, RELATING TO, AND/OR IN CONNECTION WITH THE MARKETING PROCESS, SALES PROCESS, PURCHASE OF THE OWNERSHIP, USE OF THE OWNERSHIP, AND/OR ANY BREACH OF THIS AGREEMENT. SELLER'S MAXIMUM LIABILITY TO OWNER ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, SHALL BE THE TOTAL AMOUNT PAID TO SELLER UNDER THIS AGREEMENT. OWNER EXPRESSLY WAIVES ANY RIGHT TO SEEK RELIEF IN EXCESS OF THE LIMITATION OF LIABILITY SPECIFIED IN THIS SECTION.

**I have read and agree to the Dispute Resolution/Arbitration Clause:**

**INITIALS:  Owner(s)**  ___(crb)___ ,  ___(ub)___ ,  _____ ,  _____

ClubTN                                    Page 8 of 10                                    No. 2008/Rev. 5-19

DocuSign Envelope ID: B6415JD0-6F16-41ED-B27E-6514CA00CF66

IIIIIII222222222222222

Contract Number:  00019-1902720

### I. MISCELLANEOUS PROVISIONS

**39. Agency of Multiple Owners.** Each Owner signing below hereby appoints each other Owner signing below as his or her agent for dealing with Seller and any Holder or Co-Holder of this Agreement for any purpose.

**40. Effectiveness of Agreement/Closing.** This Agreement will become effective upon execution by all Parties and shall be deemed to have closed (the **"Closing"**) when all of the following conditions have occurred unless waived by Seller: (a) any applicable rescission period has expired; (b) the Owner has paid to Seller a down payment equal to not less than ten percent (10%) of the sum of the Purchase Price and the Processing Fee in immediately available funds; and (c) Seller has sufficient Points to deliver to Owner. In no event will the Closing occur later than the first anniversary of the Contract Date and if Closing has not occurred on or prior to the date of the first anniversary of the Contract Date, this Agreement shall be deemed automatically terminated and of no further force and effect. In the event this Agreement is automatically terminated in accordance with the provisions of the immediately preceding sentence and the Closing does not occur through no fault of Owner then within fifteen (15) days after the first anniversary of the Contract Date, Owner may request Seller to refund to Owner all funds paid by Owner under this Agreement.

**41. Termination of Agreement with Blocked Persons.** Under United States Presidential Executive Order 13224 (the **"Executive Order"**), Seller is required to ensure that it does not transact business with persons or entities determined to have committed, or pose a risk of committing or supporting, terrorist acts and those identified on the list of Specially Designated Nationals and Blocked Persons (the **"List"**), generated by the Office of Foreign Assets Control of the U.S Department of the Treasury. The names or aliases of these persons or entities (**"Blocked Persons"**) are updated from time to time. In the event Seller learns that Owner's name appears on the List, Seller reserves the right to delay the Closing pending Seller's investigation into the matter. If Seller is advised and/or determines that Owner is a Blocked Person, Seller reserves the right to terminate this Agreement and/or to take all other actions necessary to comply with the requirements of the Executive Order. The provisions of this Section will survive Closing and/or termination of this Agreement.

**42. Purchase Money Protection.** All payments made by the Owner shall be protected by a surety bond held by First American Title Insurance Company, 400 International Parkway, Suite 380, Lake Mary, Florida 32746 (**"Escrow Agent"**), from the date of sale until Closing has occurred.

**43. Definition of Terms.** All capitalized terms not otherwise defined within this Agreement shall have the meaning given to them in the Club Instruments.

**44. Electronic Signatures.** Owner(s) agrees that if this Agreement is signed electronically by the Owner(s), it is a transferable record.

**45. Receipt for Documents.** Owner acknowledges that the Owner has received a completed copy of this Agreement, required disclosure documents, including without limitation, the Public Offering Statement, Articles of Incorporation and By-laws of the Association, the Declaration for the ClubWyndham Access Vacation Ownership Plan and the Regulations for the Club, and that the Owner has been given a satisfactory opportunity to read this Agreement.

### NOTICE TO BUYER (OWNER):

1. Do not sign this Agreement before you read it or if it contains any blank spaces to be filled in;

2. You are entitled to a completely filled in copy of this Agreement;

3. You can prepay the full amount due under this Agreement at any time;

4. If you desire to pay off in advance the full amount due, the amount which is outstanding will be furnished upon request;

5. **Receipt.** Owner has received an exact copy of this Agreement and any other document(s) signed with this Agreement, with all blanks filled in.